CORA A. Cox, Appellant, v. GEORGE L. Cox, Executor, et al., Appellees.

DESCENT AND DISTRIBUTION: Surviving Spouse—Election—
1 Compromise Agreement—Fraud. An agreement by a wife to accept the provisions of her deceased husband's will in her behalf, and an additional amount as a compromise settlement, is, in the absence of fraud, a finality. Evidence reviewed, concerning the execution of such a contract, and held insufficient to show fraud.

WEAVER, J., dissents as to conclusion of fact.

CONTRACTS: Validity of Assent—Cultivating Ignorance—Evi-
2 dence—Election Under Will. Principle recognized that, if one party to a contract is in error as to his rights, owing to the false representations of another, and such other designedly cultivates such error, a contract obtained thereby is invalid. Evidence reviewed, regarding the execution of an agreement by which a wife elected to accept the terms of her deceased husband's will in her behalf, and held not sufficient to bring the case within the above principle.

WEAVER, J., dissents as to fact conclusion.

936                    Cox v. Cox.                    [182 Iowa

*Appeal from Guthrie District Court.*—J. H. APPLEGATE,
                           Judge.

                        JUNE 26, 1917.

          REHEARING DENIED FEBRUARY 13, 1918.

THIS is an action in equity to set aside a contract, by
the terms of which plaintiff, appellant, agreed to accept as
her share of her husband's estate the sum of $1,000, certain
personal property, the use of the homestead, together with
the sum of $6,000, willed to her by her deceased husband in
lieu of dower, homestead, and other rights, and praying that
she be decreed to have a one-third interest in the estate of
her deceased husband, which she asks to have set off to her.
After a full hearing, the plaintiff's petition was dismissed,
and she appeals.—*Affirmed.*

*Lynch & Byers* and *Parker, Parrish & Miller,* for ap-
pellant.

*S. B. Gwin* and *C. A. Robbins,* for appellees.

PRESTON, J.—Plaintiff was a widow, about 50 years of
age, when she married deceased, in 1905. For some time
prior to her said marriage, she had been engaged as a house-
keeper for others. She was first married when about 21
years of age. Her first husband died about 1898 or 1899.
She had two children by the former husband, but none by
Mr. Cox. Deceased married his first wife about 1880,
and she died in 1903. At the time of his death, about July
2, 1914, he was 64 years of age. Mr. Cox had four chil-
dren by his first wife, three of them these defendants, and
a daughter, who died some years before. At the time
plaintiff married deceased, she had a small amount of prop-
erty, and at that time, and at his death, the estate of
deceased amounted to $80,000 or more, in addition to a resi-
dence property in Adair, worth about $4,000, which was oc-

cupied by the plaintiff and deceased as their home. His estate was increased but little, if any, after his marriage with plaintiff. At that time, he was 64 years of age, and in rather poor health, and had retired. A daughter of plaintiff's made her home with her mother and the deceased. Some of the defendants, sons of deceased, made their home with plaintiff and deceased for a time, and until they were married. The defendant George L. Cox lived with a brother-in-law, the first year after plaintiff and deceased were married, and after that, he lived with them a year or two, and up to the time he was married, in 1907, but was away from the home a part of the time. He was in business, buying cattle and hogs. The relations among all the parties were friendly. Plaintiff admits that George L. Cox was good to her, and he says that, during all the time plaintiff lived with his father, his relations with plaintiff were friendly, and the same as they would be between a young man and his mother. After the death of George W. Cox, plaintiff asked advice of George L. occasionally.

It is alleged by the defendants, but denied by plaintiff, that there was an antenuptial contract between plaintiff and deceased, which was not then reduced to writing. There is a conflict in the testimony as to whether there was such a contract. Defendants contend that there was, and that by it, it was agreed that, if the marriage occurred, the said George W. Cox would leave to plaintiff by will the sum of $6,000, in lieu of her dower and other rights. Plaintiff denies that there was such a contract. We think it cannot be well claimed that the written contract herein referred to is sufficiently specific to make the alleged parol antenuptial contract enforcible; yet, if there was such an agreement, though not enforcible as an antenuptial contract, the evidence in regard to it has a bearing on the issues in the case.

Deceased executed a will, February 22, 1906, the second paragraph of which is as follows:

"I give, devise and bequeath to my beloved wife, Cora A. Cox, the sum of six thousand (6,000) dollars in cash, same to be paid in lieu of her dower, homestead or any other rights of inheritance she may legally be entitled to out of my property. At my death, should she survive me, same to be paid within one year after my death out of my estate."

By the third paragraph of the will, he gives to his three sons the remainder of his property, and nominates his son George L. Cox, executor. After the signature of George W. Cox to said will, and before the attestation clause by the witnesses to the will, the following appears:

"State of Iowa, Adair County—ss.

"I, Cora A. Cox, wife of the said George W. Cox, being fully acquainted with the terms of his last will and testament and the full value of his property, both real, personal and mixed, and as a consideration and inducement for such cash bequest to be paid to me first, do hereby fully accept the terms of said will in lieu of my dower, homestead or other legal or inheritable rights in and to his said property after his death, and fully waive same and hereby constitute this my legal election.

"Witness my hand this 22d day of February, 1906.

"Cora A. Cox.

"Witnesses:

"M. C. Furst,

"W. H. Crooks."

Then follows the attestation clause, signed by the same witnesses. This will was admitted to probate in Adair County, September 8, 1914, and George L. Cox qualified as executor. Plaintiff says that she did not say much about the will, because she had made up her mind to be satisfied with it; but afterwards said she thought she ought to have more than the $6,000 given her by the will.

Thereafter, and on September 12, 1914, a written con-

tract was entered into by plaintiff and defendants. We set this contract out in full. It is as follows:

"Cora A. Cox.                  | Tillie Hoadley, Recorder.
Agreement with                | Filed for record September
George L. Cox, Ex'r.          |   14th, A. D. 1914, at 8:00
   et al.                      |   o'clock A. M.
                               | Recording fee, $1.50.

"Articles of Agreement entered into this 12th day of September, 1914, wherein Cora A. Cox, of the county of Adair and state of Iowa, widow of George W. Cox, deceased, late of Adair County, Iowa, is party of the first part, and George L. Cox, executor of the estate of George W. Cox, deceased, late of Adair County, Iowa, and George L. Cox, individually, of the county of Adair and state of Iowa, and Paul I. F. Cox, of the county of Guthrie and state of Iowa, and Charles E. Cox, of the county of Adair and state of Iowa, and Lena Cox, wife of George L. Cox, and Anna Cox, wife of Paul I. F. Cox, are all parties of the second part, witnesseth:

"In consideration of the sum of seven thousand dollars ($7,000.00) this day in hand paid to me by second parties in the following manner, to wit:

"The cancellation and delivery to me of my promissory note, given by me to my deceased husband, George W. Cox, dated February 1, 1912, for $272.60, drawing interest at the rate of 6 per cent per annum from date until maturity and then 8 per cent interest per annum from maturity, said note being given for thirty days and now amounting to $332.30 and the sum of $1,667.70 in cash in my hand now paid, the receipt for which is hereby acknowledged, and the joint promissory note of George L. Cox, Paul I. F. Cox and Charles E. Cox, second parties herein, for the sum of $5,000.00 due in one year, drawing interest at the rate of 6 per cent per annum and the use rent free of the residence

property now occupied by me, being Lots Two (2) and Three (3) in Block Seven (7) in C. R. I. and P. R. R. Co.'s Original Town of Adair, Adair County, Iowa, until March 1, 1916, horse harness and buggy and furniture; I, Cora A. Cox, being the widow of George W. Cox, deceased, late of Adair County, Iowa, and unmarried and first party herein do hereby and by these presents elect and adopt the last will and testament of the said George W. Cox, deceased, late of Adair County, Iowa, which was duly admitted to probate on the 9th day of September, 1914, in the district court of the state of Iowa, in and for Adair County, same being in open court on the first day of September, 1914, term thereof, and accept and adopt and confirm the same and all terms therein in lieu and instead of my dower and homestead rights and thirds and any and all right, title or interest I now have or may have had as the widow of said George W. Cox, deceased, late of Adair County, Iowa, were it not for said will, or had not same have been made and executed by the said George W. Cox, deceased, late of Adair County, Iowa, and in consideration of the above payments I fully, firmly and forever, and without power of revocation, elect to take under said will which gives me the sum of six thousand dollars ($6,000.00) in lieu of my thirds dower and homestead rights and the execution of said note for the sum of $5,000.00 as aforesaid to me by the said George L. Cox and Paul I. F. Cox, and Charles E. Cox, which I herein acknowledge has this day been done, and the rent free, to March 1, 1916, as above specified, and the payment to me of the sum of $1,-667.70, which I hereby acknowledge has been made, is a full and complete payment to me of the six thousand dollars ($6,000.00) bequeathed and devised to me under said will and the overplus is received by me as a compromise and settlement of all my right, title and interest in and to the real, personal, and mixed estate of the said George W. Cox, deceased, late of Adair County, Iowa, who is my deceased

husband, and while said will did not give me a third of said estate, the same was the result of an antenuptial agreement between myself and the said George W. Cox, deceased, and the terms of same were very satisfactory to me, and the same was made, published and declared on the 22d day of February, 1906, by the said George W. Cox, to be his last will and testament and I was fully acquainted with the terms and conditions of same, and the bequest and devise therein made to me of the sum of $6,000.00 in lieu of my dower, homestead and thirds, and I hereby firmly ratify and confirm same, and elect to take, under same, in lieu of said dower, homestead or third and fully adopt same and hereby release all right, title and interest of any kind or character I now have in and to any and all real or personal property of any kind or character belonging to the estate of said George W. Cox, deceased, late of Adair County, Iowa, of which his son, George L. Cox, herein named as executor, and fully acknowledge the payment to me by said cash, note and rent, all and any sums that are due me as heir at law, widow, legatee or devisee of said estate, or the said George W. Cox, deceased, and in consideration of which payments herein acknowledged to have been made, I fully elect to take under said will as aforesaid in lieu of my dower homestead and third rights, and I hereby release said estate and the heirs at law and the executor and the legatees or devisees therein from any and all obligations, either in law, equity or probate and accept the above as a full and complete payment and discharge of any and all rights, interests or obligations due me or to become due to me, or which have been vested in me and as a complete settlement of all my right, title and interest to said estate, and I fully waive any and all notices that the law requires to be served upon me by the heirs, legatees or devisees of said will and estate to compel me to elect as by law provided, and I hereby fully demise and quitclaim all my right, title and interest in and

to all real estate of which the said George W. Cox died seized, wherever situated, whether in the United States, or Canada, and second parties herein agree to all the terms of this contract, and have fully performed same by the cancel- lation of said note and the execution and delivery to first party of the $5,000.00 promissory note and the payment to her of the said $1,667.70 and the giving to her rent free the premises above described until March 1, 1916, which pay- ments have been accepted by first party as a full and com- plete settlement under the will of said George W. Cox, de- ceased, first party having elected to take, under same, and the heirs, legatees and devisees and the estate of said George W. Cox, deceased, is hereby released of all claims and demands of any kind or character on the part of said Cora A. Cox, first party and widow of decedent, George W. Cox.

"Witness our hands this 12th day of September, A. D. 1914.

"Cora A. Cox, George L. Cox, executor of estate of George
    W. Cox, George L. Cox, Paul I. F. Cox, Chas. E. Cox,
    Lena Cox, Anna Cox, Cora A. Cox.

"State of Iowa, Adair County—ss.

"Be it remembered, that on this 12th day of September, 1914, before me the undersigned, a notary public in and for Adair County, Iowa, personally appeared George L. Cox, as executor of the estate of George W. Cox, deceased, late of Adair County, Iowa, George L. Cox, and Lena Cox, his wife, Paul I. F. Cox, and Anna Cox, his wife, and Charles E. Cox, single, and Cora A. Cox, widow of George W. Cox, de- ceased, single, to me known to be the identical persons whose names are signed to the foregoing contract and each of them acknowledged the signing and execution of same to be their voluntary act and deed.

"Witness my hand and notarial seal this 12th day of September, 1914.

"W. H. Crooks,

Notary Public in and for

"(Notarial seal.)                    Adair County, Iowa."

On April 5, 1915, plaintiff filed with the clerk a paper, which was endorsed, "Filed April 5, 1915.   G. F. Roark, Clerk."   The paper just referred to follows:

"In the District Court of Iowa in and for Adair County. In the matter of the estate of George W. Cox, deceased. Election of Survivor.

"Comes now Cora A. Cox, widow of George W. Cox, deceased, and hereby gives notice that she refuses to consent to the provisions of the last will and testament of the said George W. Cox, deceased, and elects to take her distributive share under the statute, and she hereby directs the clerk of said court to enter this election on the proper record.

"Signed this 3d day of April, A. D. 1915.

"Cora A. Cox,

"Widow of said George W. Cox, deceased."

Appellant has assigned two errors, and the points argued are based upon such assignments of error, and they are: First, that the court erred in not holding that the contract in question was obtained by fraud, and therefore invalid; second, that the court erred in not holding that the plaintiff executed this contract in ignorance of her rights in the estate of her deceased husband, and that the contract was procured by inequitable means, and therefore invalid.   Counsel for appellant concede that, if she has established neither one of these points, she can get no relief, but contend that, if she establishes either, she may receive the relief asked.   Counsel for appellant concede that the pivotal point in the case is under the second assignment of error, and that this is, as stated by the trial court, as

follows: Did she, at the time, believe that she was bound by the terms of her husband's will? If she did so believe. and the defendants took advantage of her mistake as to the effect of her signing the acceptance of the terms of the will, she is entitled to the relief demanded. Counsel also admit that this inquiry is more a question of fact than a question of law, and that there is little or no controversy found in the law applicable to this proposition. We think, too, that the first proposition is almost entirely one of fact. There is a large record, and it is not our custom to attempt to set out the evidence in these fact cases in detail. It is often impracticable to do so within the proper limits of an opinion, and such cases are not often of value as precedents. And yet it is difficult to state such cases without going somewhat into detail.

1. As to the first proposition, plain-

1. DESCENT AND DISTRIBUTION: surviving spouse: election: compromise agreement: fraud.

tiff alleges that, by reason of the fraud and undue influence of defendant George L. Cox, and S. B. Gwin, an attorney, the instrument signed by her on September 12, 1914, is void and of no effect, as she alleges; and that at that time she was so weak, mentally and physically, that she was unable to read the instrument, or to understand the same when read to her, or to realize what she was doing when she signed it; that she signed it by reason of her confidence in defendant George L. Cox, and his attorney, Gwin; that said Cox and Gwin knew that she believed she was bound by the terms of the endorsement upon the will, signed by her at the time of its execution; that they represented to her that it was necessary for her to sign the contract; that, upon the execution thereof, defendant George L. Cox filed the same for record, without leaving her a copy; that she did not know the contents of said instrument nor the effect thereof until a few days before the filing of her petition; that, at the time of the execution of said contract,

defendant George L. Cox left with her a promissory note for $5,000, signed as provided in the contract, and left with her her note, which she had theretofore given her husband, for $272.76, and deposited to her credit in bank the sum of $1,663.70. In her answer, she tenders back the papers just referred to. She has received the other property referred to in the contract, and has occupied the homestead ever since the execution of the contract. It is thought by appel-lant that there was such a fiduciary relation between plain-tiff and defendants, particularly the defendant George L. Cox, as to cast upon defendants the good faith of the transaction.

We said, in *Curtis v. Armagast*, 158 Iowa 507, and *Dawson v. National Life Ins. Co.*, 176 Iowa 362, that the relationship of principal and agent, attorney and client, parent and child, guardian and ward, is frequently men-tioned as illustrative examples creating a fiduciary or confi-dential relation by which a presumption is raised, but that such relations may exist under other circumstances. In the instant case, plaintiff and defendant George L. Cox were on friendly terms, but there is little, if any, evidence that he ever transacted business for her. It is doubtful whether, under the record in this case, there were such confidential relations between plaintiff and defendant George L. Cox as to raise a presumption against the defendants. However this may be, all the parties testified fully in regard to all matters in controversy, and, from the entire record, we agree with the conclusion of the trial court that there was no fraud practiced upon the plaintiff, as alleged.

2. Appellant's contention on the question of fraud, briefly stated, is that defendant George L. Cox and defen-dant's attorney, Gwin, stated to plaintiff that her rights in her husband's estate were cut off by her acceptance of the will. Both these parties deny that they so stated to her. Plaintiff testifies that defendant George L. told her that

her rights in her husband's estate were cut off by her acceptance of the terms of the will, and in connection therewith, appellant claims that he called her attention to a will case near Anita, where the will was sustained. As said, defendant denies that he told her that her rights were cut off. He admits that there was some conversation in regard to a will case at Anita. He testifies, in regard to this:

"Q. Did you tell her, in any of your conversations, that there was a case between Adair and Anita somewhere just like that, and the woman could not get anything? A. I did not tell her that in that way. I think I mentioned the McDermott case. I told her that I had heard that there was a McDermott case at Anita, that I had heard was similar to this, and if she wanted to get a line on this case, she could go and see them. I never advised her anything about what happened about that case, because I never looked it up, and I don't know anything about it, only as somebody accidentally told me, and I don't know who told me."

He says further: "It was the first part of August that I called her attention to this will that had been contested down near Anita. She wanted a little more money, and I told her she might look it up. I never advised her anything about it. I don't know that I told her that the will had been sustained. She was well acquainted around Anita. She told me she had been advised, and I thought perhaps she would want to look into the matter. I don't know whether it had been sustained or not. There was such a will down there I had heard about. I don't know whether I called her attention to this Anita will in connection with some question about my father's will, because she was wanting more money, and she said she was not going to sue or cause us any trouble. I don't remember just how it came up. I wanted her to be satisfied."

Appellant's contention at this point is that the reason for this defendant's calling plaintiff's attention to the Anita

will was to assure her that she was bound by the terms of this will and her acceptance. And, as stated, the claim is that George did misrepresent the facts to her, and that plaintiff believed his representations, and executed the contract.

Plaintiff is a woman of fair intelligence and education, and has had some experience in business affairs. She has been twice married and twice widowed. The record does not show the amount of the estate left by her first husband, if any; but it is shown that, when she married Mr. Cox, she owned a small amount of property in her own right. It is difficult to understand how an intelligent woman, who had been married 20 or 25 years, or more, would not know, in a general way at least, the legal rights of a widow in the estate of her deceased husband. The record shows that, on the day the contract was executed, plaintiff was somewhat indisposed, from the effects of a recent sickness; but we are convinced that she knew the object and purpose of the contract, and was reasonably informed, by the reading of the same to her, of its contents. It is clear that, when the will was executed, about a year after her marriage to deceased, she knew the contents of the will, and especially its provisions for her, and it is equally clear that she was then satisfied with its terms. Doubtless this does not bind her, but it has a bearing on the other transactions involved in the case. At the time the will was executed, plaintiff was called in, for the purpose of securing her acceptance of its provisions, doubtless with the idea that such acceptance would take the place of a written antenuptial contract. While the contract is lengthy, and there is some repetition of the matters contained therein, it is difficult to understand how anyone could have heard the contract read and not have understood that its object and purpose were to fully settle and adjust all rights and interests of plaintiff in the estate of her deceased husband. Some of the matters in the contract

are repeated so often that it would naturally call the attention of the parties to such provisions, so that it would, in our judgment, be impossible for parties reading or hearing it read to have been deceived as to its contents or its purpose. We have no doubt, under the record, that plaintiff fully understood both the contents of the instrument and its purpose, and also its effect upon her interest in and rights to her husband's estate. Without going into the record further at this point, it is our conclusion that no fraud was practiced upon the plaintiff justifying the setting aside of the contract on that ground.

3. Turning now to the controlling point in the case, counsel for appellant state their contention in this way: That appellant had signed an invalid acceptance of the will at the time the will was drawn, and that attorney Gwin advised her that it bound her and cut off her rights, and that this and the cultivation of this error by the defendants are what misled her, and not any lack of knowledge that the widow ordinarily is entitled to one third of the estate of her deceased husband.

2. CONTRACTS: validity of assent: cultivating ignorance: evidence: election under will.

We understand counsel for both sides to concede the rule to be, as stated by the trial court, under authorities cited by appellant and by the court, that, if plaintiff did not understand her rights, and the other parties did, and took advantage of her ignorance, she is entitled to relief (citing Pomeroy on Equity Jurisprudence, Sections 847 and 849). The question of fact is whether plaintiff did or did not understand her rights in the premises, and whether she believed she was bound by the terms of her husband's will. As already stated, and as conceded by counsel, the question presented is largely one of fact.

We shall refer as briefly as may be to the testimony of both sides bearing upon this point. Perhaps we should refer again briefly to the contract itself. It is therein stated

three times, or in three different places, that plaintiff releases all her right, title and interest in the estate of her deceased husband; and at least three, and perhaps four times, she declares her election to take under the will, recites the fact of an antenuptial contract, and declares, at the last, that all parties are released from further obligations to her.

Plaintiff testifies, substantially, that Mr. Gwin came to her house, about two weeks after her husband's death, and stated to her that he had been her husband's attorney from a short time after she was married up to the time of her husband's death; that there was nothing said in that talk about the will of the deceased, which had been opened and read; that he talked about deceased, and said that he and deceased had been fast friends; and that he seemed to sympathize very deeply with plaintiff. Counsel for appellant do not claim that there was any impropriety in this, or that Mr. Gwin had any ulterior motive in this visit, but that what was said by Mr. Gwin tended to create in plaintiff's mind a feeling of confidence in him. Plaintiff testifies further that Mr. Gwin came there again in a couple of weeks, and that she talked with him about the will and about the affairs of the estate. She says she knew at that time that he had been employed by the defendants and was representing them; that he told her that she had signed the will and taken her rights away; that he said this in connection with her saying that she wanted to stay in the house; and that he said in reply that she had signed the will, and that fact cut her rights off, or had taken her rights away. She testifies further:

"Subsequent to that time, and prior to the time this contract was signed, I had a talk with George Cox about the will. That was just a few days before the signing of the contract. The talk was in connection with my request that I be given something more than the $6,000, and he said that

a will like that could not be broken, because it had been tried down between Adair and Anita. He said there had been such a will made by someone between Adair and Anita, which had been tried out in the courts and had been held good, and in connection with that, he said that I had cut off my rights by signing this will. My relations with George from the time of his father's death up to this time had been friendly. He had been living about four blocks from me, and he came over to see me quite frequently, to make inquiries how I was getting along, and inquired if there was anything he could do for me, and he showed an interest in me, and treated me as a son would naturally treat a mother. I asked him one time if he would stand by me, and he said, 'Yes, ma, I will.' George had an automobile, and during this period after my husband's death, he took me out for an automobile ride occasionally."

Appellant also contends that the testimony of George Cox tends to corroborate the plaintiff. This has been already set out. She says further that, up to the time of the signing of the contract, she does not think anyone told her that she was entitled to a one-third interest in the estate of her deceased husband, and that she did not at that time know that she was entitled to that, and says that she did not know what her rights were until she talked with Mr. Lynch, a week or two before this suit was brought; and she testifies that George brought down a book that looked like the Iowa Code, but she does not say that he read anything to her out of the book that in any way misled her as to her rights in her husband's estate. She says, also, that George brought her a paper to pay $1,000 more than the $6,000 in the will, and figured something as to the interest the same would draw. A daughter of plaintiff's says she heard George read from a book that looks like the Code, but she does not undertake to tell what he read. If he read anything from the Code, there is no presumption that he read it incorrectly, and if it was with reference to

the rights of a widow, the reading would tend to inform her of her rights under the law. She denies saying to George that she knew she could get a third, but that she was satisfied; she admits that she probably told the Harrimans that she had settled, and the boys had treated her fine; that the things that caused her to bring this suit were statements made by George's wife about the McDaniels girls. These things occurred about six months after the contract was executed. This is the substance of all of plaintiff's testimony as to the matters involved in the execution of the contract.

On the other hand, the testimony for defendants is, briefly, this: Witness Grimes says that Mrs. Cox told him some people had said that she could get one third of the estate, but that she was satisfied with the will.

Mrs. Clark testifies that, before the execution of the contract, and on August 9, 1914, plaintiff said:

"I know I can get my third, but would rather not have trouble with the boys; said the house was too much to keep up on $6,000. If there is any trouble, the boys will have to start it."

Mr. Gwin denies telling plaintiff that she was bound by the will, or by her statement attached to the will; says she told him she could get the third, and that then he said to her she could stand by her agreement with her husband.

Defendant George L. Cox testified that, up until about the first of August, it seemed plaintiff was satisfied with what was in the will, and then she said to him that she ought to have a little bit more money; that he asked her if she wasn't satisfied without more money, and she said she was, and was not going to cause any trouble, but she thought the boys ought to give her a little more money; said she did not want to live in the home, because it was too far from church and too large a house; that he asked her how much she thought she ought to have, and she said she

thought she ought to have another thousand dollars; and she kept wanting another thousand dollars, and so he told her it would be all right; that he would·give her that himself, if the other boys didn't, if she thought she ought to have it; that the other boys were satisfied; that then she thought that, if the two girls were left at the home, they ought to pay her something for that, and that they agreed to pay her $25 a month, until she refused, in April, 1915, to accept the check. This was after she had brought suit to set aside the contract. He testifies to a conversation with plaintiff before September 12, 1914, as follows:

"She told me that she could get her one third, and she said, 'Your own lawyer would not advise me that I could not break the will.' I think that conversation was right around the first of August. I went over to see her, along the latter part of August or the first of September. I had several conversations during the month of August, and she always·wanted me to hurry and get this drew up, and get it in black and white. About the last of August, she told me that she had seen Mr. Furst, and he advised her that, if she did not make a kick before the will was probated, and get a settlement, she would forever have to hold her peace. We had this agreement made, and I told her, as quick as I was appointed executor by the court, we would put it in type, and I did."

He testifies further as·to what she should have, as stated in the contract, and further, that defendants were to take her New Mexico land off her hands, as she needed the money. He testifies further:

"I never advised her whether she could break the will or not. She always told me she had been advised she could break it."

He denies taking any book down to the house, or that he ever read anything from it. He says that, after the arrangement was agreed upon and the contract drawn, he

took it over to the house and gave it to her, and she read it and they looked it over and talked about it; that he saw her read it; that they waited around there all the afternoon while she read it, and the terms of the contract were discussed that afternoon; that, while she was not exactly well, she was up and around the house. He says further that plaintiff had called him down there every other day for two months; that she was trying to settle with him and get more money; that he was not trying to settle; says he never told her that she could not break the will, and does not know of any of the other boys' telling her that. He claims he left a copy of the contract lying on the table, after she had signed, and that he told Mr. Crooks to take the original and file it.

Charles Cox testified that plaintiff said Charlie Bancroft told her she could break the will, but she was not going to do it.

McDaniels testifies that plaintiff said to him that she had been advised she could break the will.

Frank Cox testified that plaintiff said to him:

"'I have been advised that I can break the will, but I do not want to; I helped plan the will.' She had been advised by several people she could break the will."

The trial court found that, conceding equal credibility of the witnesses, there could be no question but that the preponderance of the evidence is to the effect that plaintiff, prior to and at the time, was advised that she could not be held to the provisions of the will in her behalf. It is thought by appellant that the trial court simply counted the witnesses, in determining where the preponderance was. The trial court had the advantage of seeing the witnesses. But, taking the record all together, we are satisfied with the findings of the trial court. We agree with the conclusions of the trial court, as stated by it, that plaintiff was pleased with the settlement, from the time it was made up to the

time she took offense at the conduct and language of the wife of defendant George Cox, and probably up to the time of the bringing of the action in Adair County to remove her as guardian of the McDaniels children. Prior to this, though she may not at all times have been satisfied with the provisions for her in the will, yet she evidently desired to comply with her husband's will and wish in the matter. As we understand the record, plaintiff does not claim that she did not know of the recitation in the contract that there was an antenuptial agreement between herself and her husband, as stated in the contract.

We agree, too, with the trial court's suggestion that he would have been better satisfied if plaintiff had been left a larger amount from her husband's estate; but she had a right to contract and fix the amount, and if there was no fraud, and she understood her rights, she is bound thereby. It is true she was the wife of deceased, and entitled to all the rights the law gives her as his widow; yet, in fixing the amount she was willing to take, she and her husband doubtless took into consideration the fact that she had not helped to accumulate any of the property. Clearly, there is equity in favor of the children by the first marriage, who helped make the property left by deceased.

Some other questions are argued; but they seem to be not in the case, or necessary to a determination of the points relied upon by appellant.

It is our conclusion that no fraud appears, and that the contract was entered into by plaintiff understandingly, and that she is bound thereby. It follows, then, that the decree of the district court ought to be, and it is,—*Affirmed*.

GAYNOR, C. J., LADD, EVANS, SALINGER, and STEVENS, JJ., concur.

WEAVER, J., dissents.